IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Shirley M. Green, | ) | C/A No. 1:10-1840-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Michael J. Astrue, Commissioner, | ) | |
| Social Security Administration | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civil Rule 73.01(B) (D.S.C.), and the Honorable Henry F. Floyd's July 16, 2010 order referring this matter for disposition. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals.

Plaintiff files this appeal pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Insurance Benefits ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the Commissioner's decision is reversed and remanded for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On December 12, 2006, Plaintiff filed an application for DIB and SSI, claiming disability since November 1, 2006.  Tr. at 110 19.  Plaintiff claimed that she satisfied the requirements of several subsections of Listing 12.03, Schizophrenic, Paranoid and other Psychotic Disorders, of the "Listed Impairments," found at 20 C.F.R. § pt. 404, subpt. P, app. 1 [hereinafter cited as "the Listings"].  Tr. at 109.  Plaintiff's applications were denied initially and on reconsideration.  Tr. at 52 61, 64 69. On November 24, 2008, the Administrative Law Judge ("ALJ") held a hearing at which Plaintiff, her sister, and a vocational expert ("VE") testified.  Tr. at 21 51 (Hr'g Tr.).  In a February 23, 2009 decision, the ALJ found Plaintiff was not disabled.  Tr. at 12 20. The Appeals Council denied Plaintiff's request for further review, making the ALJ's decision the Commissioner's final decision for purposes of appeal.  Tr. at 1 5. On July 15, 2010, Plaintiff timely filed this action seeking judicial review of the Commissioner's decision.

B.     Plaintiff's Relevant Medical History

Plaintiff was 43 years old as of November 1, 2006, her alleged onset date.  She has past relevant work as an assembly line worker and as a certified nurse's assistant.  Tr. at 36, 122 25.

In January 1991, Plaintiff went to Waccamaw Mental Health Center ("Waccamaw") after being hospitalized because of confusion.  Tr. at 333.  She was

2

diagnosed with schizophrenia acute, possible atypical psychosis, and possible psychotic depression, and was prescribed medication.  Tr. at 333.

Plaintiff was an inpatient at B. Werber Bryan Psychiatric Hospital from October 1 through October 15, 1991.  Tr. at 426  29.  She was released to live with her mother and was prescribed medications.  Tr. at 428.  On October 30, 1991, she returned to Waccamaw and was told to remain on medication to control her psychosis.  Tr. at 331. Plaintiff's medical records reflect that she continued treatment for her schizophrenia at Waccamaw through 2004.  Tr. at 275  330.

The January 11, 2005 treatment notes from a physician at Waccamaw indicate that Plaintiff was doing well and that she had been laid off from her job at Tupperware. Tr. at 236.  On May 4, 2005, Plaintiff returned to Waccamaw and reported that she had been doing well with Haldol, the medication she had been receiving via injection.  Tr. at 244. On August 2, 2005, she returned to Waccamaw for a Haldol injection and a routine follow-up appointment.  Tr. at 244.  She remained stable.  The physician discussed possible changes to her medication and schedule.  Tr. at 244.  Plaintiff reminded him that she was attending college classes and questioned whether it would be a good time to change her medical regimen.  Tr. at 244.  The physician "applauded her insight and assertiveness" that it was not the time to change her medications or regime.  Tr. at 244.

At her November 2, 2005 visit to Waccamaw, Plaintiff indicated she was doing well and enjoying school.  Tr. at 237.  She was to continue receiving Haldol injections

3

every four weeks.  Tr. at 237.  On December 21, 2005, she reported that she was doing well and was stable in her symptoms.  Tr. at 237.  She indicated she was close to completing her courses and was considering looking for a job.  Tr. at 237.

On April 19, 2006, Plaintiff saw Susan Redge, MD at Waccamaw.  Dr. Redge reported that Plaintiff had been treated at Waccamaw for more than ten years and that she was taking Haldol. Tr. at 238.  Plaintiff reported that she had recently been raped and that she returned to Waccamaw requesting to resume Haldol for her "bad nerves."  Tr. at 238.  Dr. Redge described Plaintiff as being neatly dressed and pleasant, with a depressed mood and a constricted affect.  Tr. at 238.  She prescribed Seroquel, an oral medication, and instructed Plaintiff to return in two weeks.  Tr. at 238.

Dr. Redge's April 22, 2006 treatment plan for Plaintiff included goals of Plaintiff's no longer hearing voices and of Plaintiff's being able to care for her children. Tr. at 239.  The plan continued her on Haldol injections.  Tr. at 239.

On May 18, 2006, Plaintiff again saw Dr. Redge, who noted that Plaintiff had been taking Haldol for more than 15 years and that she had experienced some extrapyramidal symptoms (i.e., neurological side effects of anti-psychotic medication, manifesting in various movement disorders).  Tr. at 240.  Dr. Redge also noted Plaintiff was at risk for developing tardive dyskinesia (another side effect of anti-psychotic medication, characterized by involuntary movements). Tr. at 240.  Dr. Redge observed that Plaintiff had been tolerating Seroquel without side effects, although she had not been consistently

compliant in taking her medications. Dr. Redge reminded Plaintiff she needed to take her medications. Tr. at 240.

Plaintiff went to the Williamsburg Regional Hospital's emergency room ("ER") on August 5, 2006, with complaints that her nerves were bothering her and that she felt others were talking about her and wanted to harm her. Tr. at 222 28. She reported having had more problems since her medication was changed from Haldol injections to Seroquel tablets. Tr. at 222. She was given a Haldol injection and discharged after reporting that she felt better. Tr. at 227.

Plaintiff returned to the ER on August 10, 2006, complaining that she could not sleep and that she was having visual and auditory hallucinations. She admitted she had not taken her medications. Tr. at 211 19. Plaintiff's mother reported that Plaintiff had been doing well with monthly Haldol injections, but that she "had not been right since" the Haldol was discontinued and she was switched to a daily medication regimen. Tr. at 213. On the same date, Dr. Redge made a note in Plaintiff's file that she had been to the ER "complaining of vague symptoms," that she received oral Haldol, and that she asked to be put back on Haldol injections. Tr. at 241.

Plaintiff missed her appointments with Dr. Redge on August 23 and 31, 2006. Tr. at 242. On September 26, 2006, she returned to Dr. Redge, who noted that she was "very well dressed and groomed." Tr. at 242. Plaintiff told Dr. Redge she had been working as a certified nurse's aid. Tr. at 242. She complained of "vague symptoms," and told Dr.

Redge that Seroquel and Haldol had been helping her to think clearly. Dr. Redge noted Plaintiff was tolerating her medications without side effects. Tr. at 242.

On November 18, 2006, several weeks after her alleged onset date of November 1, 2006, Plaintiff went to the ER complaining that she was having auditory hallucinations, that her nerves were bothering her, and that she was having problems at work. Tr. at 200–03. She indicated that she went to the mental health clinic monthly, but she admitted she had not been taking her oral medication regularly and that she had not increased her medication doses as her doctor had ordered. Tr. at 200.

Dr. Redge saw Plaintiff emergently on November 21, 2006, because she had become combative with her family the previous night, was crying uncontrollably, and "believe[d] she [] caused all the suffering of the world." Tr. at 243. Dr. Redge gave Plaintiff her Haldol injection eight days early and ordered that the dosage of Haldol be increased the following month. Tr. at 243. Dr. Redge also prescribed Geodon 10 mg, and told Plaintiff to double her Seroquel dosage for several days. Tr. at 243.

On December 4, 2006, Dr. Redge saw Plaintiff and reported that she seemed sedated. Tr. at 243. Plaintiff told Dr. Redge that she did not know whether she "was coming or going." Tr. at 243. Dr. Redge reported that Plaintiff was not having side effects from Haldol or Seroquel, that she was neatly groomed, was in a good mood with stable affect, and that she appeared stable. Tr. at 243.

6

On February 13, 2007, state agency psychologist Robert Coyle, Ph.D. reviewed Plaintiff's medical records and completed a Psychiatric Review Technique Form ("PRTF") in which he considered Plaintiff's condition based on Listing 12.03. Tr. at 407 20. He opined that Plaintiff's schizophrenia was a medically-determinable impairment, but that it did not precisely satisfy the diagnostic criteria listed on the form. Tr. at 409. Dr. Coyle considered Plaintiff's functional limitations in evaluating whether Plaintiff satisfied the paragraph B criteria of Listing 12.03. Tr. at 417. He opined that Plaintiff had mild restriction of activities of daily living and in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. Tr. at 417. Dr. Coyle found that Plaintiff's medical records did not establish that she satisfied Listing 12.03's paragraph C criteria. Tr. at 418.

Dr. Coyle also completed a mental residual functional capacity ("RFC") assessment form and indicated that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; completed a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and respond appropriately to changes in the work setting. Tr. at 403 04. Dr. Coyle stated Plaintiff could understand, remember, and

7

carry out simple and semi-detailed instructions and relate adequately to co-workers and supervisors, but would have difficulty relating to the public and responding to fast-paced change or heavy production demands. Tr. at 405.

On February 14, 2007, Dr. Redge completed a form indicating that she had diagnosed Plaintiff with schizophrenia, unspecified [Diagnostic Code 295.90] and that she had prescribed monthly Haldol injections and Seroquel tablets, which were helping Plaintiff's condition. Tr. at 423. She opined Plaintiff was oriented to person and place, but not to time or situation; had a distractible thought process and suspicious thought content, as well as a flat and depressed mood/affect and poor attention/concentration and memory. Tr. at 423. She also opined that Plaintiff exhibited a "moderate" work-related limitation in function. Tr. at 423.

On March 13, 2007, Plaintiff reported to Dr. Redge that she had been having some good and some bad days, was tolerating the Haldol without side effects, and that she had not been taking the Seroquel. Tr. at 263. Dr. Redge observed that Plaintiff was neatly dressed, pleasant, polite, and exhibited no involuntary movements. Tr. at 263. Dr. Redge noted that Plaintiff seemed to be doing much better and continued her on Haldol. Tr. at 263.

On April 6, 2007, state agency psychologist Judith Von, Ph.D. reviewed Plaintiff's medical record and completed a PRTF. Tr. at 477 90. She considered Plaintiff's condition based on Listing 12.03. She opined that Plaintiff's diagnosed schizophrenia

was a medically-determinable impairment, but that it did not precisely satisfy the diagnostic criteria listed on the form. Tr. at 479. Dr. Von considered Plaintiff's functional limitations in evaluating whether Plaintiff satisfied the paragraph B criteria of Listing 12.03. Tr. at 487. She opined that Plaintiff had mild restriction in maintaining concentration, persistence, or pace; and no restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. Tr. at 487. Dr. Von indicated that Plaintiff did not satisfy Listing 12.03's paragraph C criteria. Tr. at 488.

Dr. Von also completed a mental RFC assessment form. Tr. at 491 94. She opined that Plaintiff was moderately limited in the following ways: her ability to understand, remember, and carry out detailed instructions; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. at 491 92. She also found Plaintiff was moderately limited in both her ability to interact appropriately with the general public and to respond appropriately to changes in the work setting. Tr. at 491 92. Dr. Von found Plaintiff could understand, remember, and carry out simple and semi-detailed instructions and relate adequately to co-workers and supervisors, but that she would have difficulty relating to the public and responding to fast-paced change or heavy production demands. Tr. at 493.

9

On June 4, 2007, Jeff Bridgman, a licensed counselor at Waccamaw who treated Plaintiff, completed a Mental Impairment Questionnaire and rendered an opinion regarding Plaintiff's mental condition. Tr. at 256 61.  Mr. Bridgman stated Plaintiff had been receiving regular mental health treatment since 1991 and that she had a Global Affect Functioning ("GAF") score[1] of 65.  Tr. at 256.  He indicated that she was prescribed monthly Haldol injections, that she responded well to medications, and that her prognosis was good when she complied with doctors' recommendations. Tr. at 256.  Mr. Bridgman noted that the medication's side effects of joint stiffness, lethargy, and possible swelling of the tongue could cause implications in her ability to work.  Tr. at 256.  Mr. Bridgman listed the following as his clinical findings regarding Plaintiff's mental impairment:  a history of audio hallucinations, some paranoid delusions, and elevated anxiety and depression.  Tr. at 256.  He noted Plaintiff had:  decreased energy; thoughts of suicide; blunt, flat, or inappropriate affect; difficulty thinking or concentrating; change in personality; paranoid thinking or inappropriate suspiciousness; disorientation to time and place; perceptual or thinking disturbances; hallucinations or delusions; loosening of

_____

[1]A GAF score represents a score on a numeric scale of 0 through 100, which is contained in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, fourth edition ("DSM-IV") and may be used to rate the severity of psychological symptoms and/or social, occupational, or school functioning. A GAF score may reflect the severity of symptoms or impairment in functioning at the time of the evaluation.  *Id.* at 32 33.  *See Chapman v. Astrue*, C/A No. 07-2868-TLW, 2010 WL 419923 (D.S.C. Jan. 29, 2010) (*citing* DSM-IV in discussing a GAF).

associations; easy distractibility; memory impairment; sleep disturbance; and oddities of thought, perception, and behavior.   Tr. at 257.

Mr. Bridgman also considered Plaintiff's ability to do work-related activities on a day-to-day basis in a regular work setting. Tr. at 258.  He opined that Plaintiff was "seriously limited but not precluded" from: maintaining attention for two-hour segments; sustaining an ordinary routine without supervision; working in coordination with or proximity to others without being unduly distracted; making simple work-related decisions; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; dealing with normal work stress; and being aware of normal hazards and taking appropriate precautions. Tr. at 258.  Mr. Bridgman opined that Plaintiff was susceptible to "over stimulation, anxiety, confusion, and ideas of reference when in environments involving close proximity to others." Tr. at 258. He also opined that Plaintiff was seriously limited, but not precluded from, setting realistic goals, dealing with the stress of skilled and semi-skilled work, and traveling in unfamiliar places.  Tr. at 259.  He noted that she could experience elevated anxiety when in unfamiliar environments.  Tr. at 259. In considering Plaintiff's functional limitations, Mr. Bridgman opined that Plaintiff had marked difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.  Tr. at 260.  Further, he indicated that she had experienced three

episodes of decompensation within the 12 months prior to completing the questionnaire and that these episodes had lasted at least two weeks. Tr. at 260. In responding to whether any of Listing 12.03's paragraph C criteria applied to Plaintiff, Mr. Bridgman opined that she had a "medically documented history of a chronic, organic mental [] disorder of at least 2 years' duration" that "caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs" that were "attenuated by medication or psychological support." Tr. at 260. In addition to the three episodes of decompensation, Mr. Bridgman further opined that Plaintiff had a residual disease process that had resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause Plaintiff to decompensate. Tr. at 260. He opined that Plaintiff was not a malingerer, that her impairment had lasted more than 12 months, and that her impairment was consistent with the symptoms and functional limitations described. Tr. at 261.

On June 11, 2007, Plaintiff saw Dr. Redge for a follow-up visit. Tr. at 503. Dr. Redge noted that Plaintiff was stable and was living with her parents. Tr. at 503. Dr. Redge described Plaintiff as having a good appetite and sleep, and indicated that she was neatly dressed and groomed, that she sat calmly, and that she was soft spoken and polite. Tr. at 503. Dr. Redge indicated that Plaintiff had a constricted affect and disorganized thoughts. Tr. at 503. Dr. Redge continued Plaintiff on Haldol and instructed her to return in three months. Tr. at 503.

Plaintiff saw Dr. Redge again on September 19, 2007. Tr. at 504. Plaintiff told Dr. Redge that she had no new issues, but that she was having some difficulty sleeping because of things that bothered her. Tr. at 504. Dr. Redge observed that Plaintiff was neatly dressed, sat calmly, had no involuntary movements, and was nonspontaneous. Tr. at 504. She noted Plaintiff's mood was good and her affect was constricted. Dr. Redge observed that Plaintiff had a history of decompensation the previous year when her Haldol had been discontinued. Tr. at 504. Dr. Redge continued Plaintiff on Haldol, and offered to prescribe an antidepressant. Tr. at 504. Plaintiff indicated she did not wish to be on additional medication at that time. Tr. at 504. Plaintiff was instructed to return in three months, or earlier if she decided she wanted to try a prescription antidepressant. Tr. at 504. The following week, on September 26, 2007, Plaintiff contacted Waccamaw staff and requested a prescription for an antidepressant. She was prescribed Lexapro. Tr. at 504. On December 31, 2007, Plaintiff requested a replacement prescription for Lexapro, which Dr. Redge provided. Tr. at 505. She informed Dr. Redge that she had taken samples and experienced no side effects from the Lexapro. Tr. at 505.

Plaintiff returned to Dr. Redge on January 9, 2008, and told her she had not been experiencing side effects from her medications, although she indicated she did not always remember to take Lexapro. Tr. at 506. Dr. Redge noted that Plaintiff was neatly dressed, sat calmly, and that her mood was good and her affect constricted. Tr. at 506. Dr. Redge

noted Plaintiff was positive for cognitive deficits.  Tr. at 506.  Dr. Redge continued Plaintiff on Haldol and Lexapro and told her to return in three months.  Tr. at 506.

Plaintiff again saw Dr. Redge on April 9, 2008. Tr. at 506.  Dr. Redge noted that Plaintiff was tolerating Haldol and Lexapro without side effects and was remembering to take Lexapro more regularly.  Tr. at 506.  Plaintiff informed Dr. Redge that she felt happier and that her appetite and sleep were good.  Tr. at 506.  Dr. Redge observed that Plaintiff sat calmly, was pleasant and polite, was nonspontaneous, showed no involuntary movements, and that her mood was good and her affect constricted. Tr. at 506.  Dr. Redge planned to keep her on the same medications and noted that Plaintiff had requested a female counselor.  Tr. at 506.

On May 7, 2008, Dr. Redge established a plan of care for Plaintiff's diagnosis of schizophrenia, which included the goal of Plaintiff's handling things better to avoid future hospitalization, attending scheduled appointments every three months, and complying with her medications. Tr. at 576.

At her July 9, 2008 visit, Plaintiff told Dr. Redge that her nerves had been bad since her last visit, that she had not been sleeping well, and that she was restless and anxious.  Tr. at 590.  On examination, Dr. Redge found Plaintiff to be pleasant, polite, and spontaneous. Tr. at 590. She noted that Plaintiff displayed no involuntary movements, and that she was goal oriented.  Tr. at 590.  Dr. Redge also noted Plaintiff had an anxious

mood, a constrictive affect, and that her insight and judgment were impaired. Tr. at 590. Dr. Redge added Buspar to Plaintiff's medication regimen. Tr. at 590.

On September 18, 2008, Dr. Redge competed a Mental Impairment Questionnaire. Tr. at 581 87. She reported that Plaintiff had a history of audio hallucinations, delusions, anxiety, and depression. Tr. at 581. She noted that Plaintiff had responded fairly well to medications and had responded more favorably to injection medications. Tr. at 581. Dr. Redge stated Plaintiff had a GAF score of 65 and that her prognosis was favorable if she remained compliant with her treatment. Tr. at 581. Dr. Redge indicated Plaintiff's signs and symptoms included decreased energy; blunt, flat, or inappropriate affect; feelings of guilt or worthlessness; generalized persistent anxiety; difficulty thinking or concentrating; change in personality; apprehensive expectation; paranoid thinking or inappropriate suspiciousness; emotional withdrawal or isolation; disorientation to time and place; perceptual or thinking disturbances; hallucinations or delusions; flight of ideas; loosening of associations; illogical thinking; pathologically inappropriate suspiciousness or hostility; sleep disturbance; and oddities of thought, perception, and behavior. Tr. at 582. Dr. Redge also opined that Plaintiff was seriously limited, but not precluded from remembering work-like procedures; carrying out very short and simple instructions; maintaining attention for two hour segments; maintaining regular attendance and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly

15

disrupted; making simple work-related decisions; completing a normal workday and workweek without interruptions from psychologically based symptoms; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in a routine work setting; dealing with normal work stress; and being aware of functional hazards and take appropriate precautions. Tr. at 583. Dr. Redge opined that Plaintiff was unable to meet competitive standards in performing at a consistent pace without an unreasonable number and length of rest periods and that she could not meet competitive standards in her interacting with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. Tr. at 583. Dr. Redge noted that Plaintiff manifested symptoms when exposed to what would be normal stressors to most individuals. Tr. at 583. She noted that Plaintiff's symptoms included departure from reality based rational thinking. Tr. at 583. Dr. Redge further opined that Plaintiff's ability to understand, remember, and carry out detailed instructions; set realistic goals; and deal with the stress of semi-skilled and skilled work were seriously limited, but were not precluded. Tr. at 584. Dr. Redge stated Plaintiff had a residual disease process that had resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause her to decompensate and that she had a history of one or more years' inability to function outside a highly-supported living arrangement with an indication of continued need for such an arrangement. Tr. at 585. Dr. Redge also opined that Plaintiff's impairments and treatment of impairments

16

would cause her to be absent from work for more than four days per month.  Tr. at 587.

Dr. Redge opined that Plaintiff had marked difficulties in maintaining social functioning

and in maintaining concentration, persistence, and pace. Tr. at 587.  Further, Dr. Redge

opined that Plaintiff had mild restrictions of activities of daily living and had had no

episodes of decompensation in the prior 12 months.  Tr. at 587.

On October 8, 2008, Plaintiff returned to Waccamaw and complained to Dr. Redge

that buspirone was making her sick. Tr. at 591.  Dr. Redge reduced the dosage and

instructed Plaintiff to continue the medication.  Tr. at 591.  Dr. Redge noted that Plaintiff

had suspicious behavior in that she did not open up easily. Tr. at 591. She noted that

Plaintiff was alert, oriented, and cooperative, and that she had normal speech, attention,

concentration, and memory. Tr. at 591.  Plaintiff had a euthymic mood, appropriate affect,

and her thought process was logical and goal directed. Tr. at 591. Dr. Redge characterized

Plaintiff's judgment and insight as impaired/fair.  Tr. at 591.  Dr. Redge assigned Plaintiff

a GAF score of 60 and indicated she planned to continue monitoring Plaintiff's

medications. Tr. at 591.

Subsequent to her November 2008 administrative hearing, Plaintiff returned to Dr.

Redge on December 29, 2008.  Tr. at 594  96.  Her mental status examination remained

unchanged from her October 2008 examination. Tr. at 594  96. Similarly, her examination

was unchanged when she saw Dr. Redge on March 16, 2009.  Tr. at 596.

C.    Administrative Proceedings

1.    The Administrative Hearing

At the hearing on November 24, 2008, Plaintiff testified that she had worked as an assembly-line worker from 1987 to 2005 and that she worked for a few months as a certified nurse's assistant in 2006. Tr. 26  27. Plaintiff said she was laid off of her job as an assembly-line worker, and she then went to school to obtain her nursing assistant credentials. Tr. at 36. Plaintiff reported that she had problems concentrating and focusing when studying to become a nurse's assistant. Tr. at 37. She said that she had difficulty meeting the mental demands of the nurse's aid job. Tr. at 37. She indicated that she had assisted at a neighbor's flower shop several times in 2008. Tr. at 28.

Plaintiff testified that she received Haldol injections once a month, and that they kept her from hallucinating. Tr. at 30. She testified that she was easily irritated, had difficulty listening to instructions, and that it caused her too much stress for others to tell her what to do. Tr. at 31.

She stated she lived with her sons, who were ages 15 and almost 12 at the time of the hearing. Tr. at 32. She also said that she had several brothers and sisters who lived near her and checked on her everyday. Tr. at 33. Plaintiff testified that on some days she would not get dressed or leave the house because it was too stressful. Tr at 34. She indicated that she could drive, but got confused if she tried to drive outside of her home town. Tr. at 39.

Plaintiff's sister, Ola McClary, testified that she and her other siblings checked on Plaintiff and helped her with her finances. Tr. at 43. She stated that Plaintiff had difficulty getting herself washed and dressed in the morning and that she had difficulty completing household chores. Tr. at 43 44. Plaintiff's sister also said that Plaintiff's condition had worsened since she was laid off from her assembly-line job. Tr. at 44. She noted Plaintiff had difficulty staying focused and maintaining concentration and that it was a struggle for her to get out of bed, bathe, and dress. Tr. at 44 47.

The ALJ asked VE Jason McKay to assume a person of Plaintiff's age, education, and past work experience who had no physical limitations, but who was limited to simple, repetitive tasks, had no production quotas, did no work with the general public, had very limited interaction with co-workers, meaning she would have fewer than five co-workers, and had some difficulty with concentration, but could maintain concentration, persistence, and pace at two-hour intervals. Tr. at 48. The VE testified that the jobs of cleaner, cloth folder, and packer would accommodate an individual with such limitations. Tr. at 48 49.

2.    The ALJ's Decision

In issuing her February 23, 2009 decision, the ALJ followed the five-step sequential evaluation process for evaluating disability claims. 20 C.F.R. § 404.1520. At step one, the ALJ found Plaintiff had not engaged in any substantial gainful activity since her alleged onset date. Tr. at 14. At step two, she found that Plaintiff's schizophrenia was a severe impairment. Tr. at 15. At step three, the ALJ found that Plaintiff's

19

impairments did not meet or medically equal the requirements of any of the Listings. Specifically, the ALJ found that Plaintiff did not meet Listing 12.03.  *See* 20 C.F.R. part 404, subpt. P, app. 1.  Tr. at 15.  At step four, the ALJ found that Plaintiff could not perform her past relevant work ("PRW"), but that she retained the RFC to perform work at any exertional level with some specific nonexertional limitations.  Tr. at 16 18.  At step five, the ALJ consulted a VE and found there were jobs in the national economy that Plaintiff could perform.  Tr. at 19.  Thus, the ALJ concluded that Plaintiff was not disabled.  Tr. at 20.

II.    Discussion

Plaintiff's principal argument is that the ALJ erred by finding Plaintiff did not satisfy the requirements of Listing 12.03 and that she did not adequately explain her reasons that finding.  Pl.'s Br. at 14 18.  Plaintiff also argues that the ALJ erred by failing to give controlling weight to the opinion of Plaintiff's treating physician.  Pl.'s Br. at 19 25. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    The ALJ's Findings

In her February 23, 2009, decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.    The claimant has not engaged in substantial gainful activity since November 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairment: schizophrenia (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can maintain concentration, persistence and pace for 2 hour intervals and is limited to simple, repetitive tasks involving no production quotas, limited interaction with co-workers (less than 5), and no contact with the general public due to her mental impairment.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on December 7, 1962 and was 43 years old, which is defined as a younger individual, on the alleged disability onset date (20 CFR 1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82 41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 1, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 14 16, 18 19.

B.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings; (4) whether such

impairment prevents claimant from performing PRW; and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step.).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82  62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a vocational expert ("VE") demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to

23

perform other work. *Hall v. Harris*, 658 F.2d 260, 264 65 (4th Cir. 1981)*; see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157 58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek v. Finch*, 428 F.2d at 1157 58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

24

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

      C.     Analysis

            1.     Listing 12.03

Although the ALJ found Plaintiff suffered from the severe impairment of schizophrenia, she found that Plaintiff did not meet or medically equal the specified requirements of *Listed Impairment 12.03 Schizophrenic, Paranoid, and Other Psychotic Disorders*. Tr. at 15. Plaintiff claims this was error.

To satisfy a Listing, a person must meet all criteria that Listing requires. A claimant may satisfy the criteria of Listing 12.03 in one of two ways: (1) claimant must satisfy the criteria of paragraphs A *and* B; or (2) claimant must satisfy the criteria of paragraph C. Listing 12.03 provides in full as follows:

12.03 Schizophrenic, Paranoid and Other Psychotic Disorders

Characterized by the onset of psychotic features with deterioration from a previous level of functioning.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.     Medically documented persistence, either continuous or intermittent, of one or more of the following:
     1.     Delusions or hallucinations; or
     2.     Catatonic or other grossly disorganized behavior; or

    3.      Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:

          (a)     Blunt affect; or

          (b)     Flat affect; or

          (c)     Inappropriate affect; Or

    4.      Emotional withdrawal and/or isolation; And

B.     Resulting in at least two of the following:

    1.      Marked restriction of activities of daily living; or

    2.      Marked difficulties in maintaining social functioning; or

    3.      Marked difficulties in maintaining concentration, persistence, or pace; or

    4.      Repeated episodes of decompensation, each of extended durations; Or

C.     Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

    1.      Repeated episodes of decompensation, each of extended duration; or

    2.      A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

    3.      Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.03.

     Plaintiff argues that she satisfies the requirements of Listing 12.03 because she

satisfies requirement 1 from paragraph A and requirements 2 and 3 of paragraph B.  She

also alleges that she satisfies paragraph C through requirements 2 and 3. Pl.'s Br. at 14 18.

The ALJ set out Listing 12.03's paragraph A and B criteria, but she did not explain the paragraph C criteria. Tr. at 15. The ALJ found that Plaintiff did not meet or medically equal Listing 12.03 by focusing only on the paragraph B criteria, which she found Plaintiff did not satisfy. Tr. at 15 ("In making this finding [that Plaintiff did not meet or medically equal the criteria of Listing 12.03], the undersigned has considered whether the 'paragraph B' criteria are satisfied."). The ALJ found the following regarding the paragraph B criteria: Plaintiff had mild restriction in activities of daily living; moderate difficulties in social functioning; and moderate difficulties regarding concentration, persistence, and pace. Tr. at 15. The ALJ also found Plaintiff had experienced no extended episodes of decompensation. Tr. at 15. The making these findings, the ALJ did not cite to specific record evidence or otherwise explain the reasons for her findings.

The ALJ also found Plaintiff did not satisfy Listing 12.03's paragraph C criteria, simply stating the following:

> The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

Tr. at 15.

Plaintiff argues that the ALJ's erred because (1) her findings that Plaintiff did not satisfy the paragraph B criteria are not supported by substantial evidence; and (2) her analysis of the paragraph C criteria was incomplete and unsupported by the record. The Commissioner counters that the ALJ's decision is supported by substantial record evidence and that the ALJ's decision sufficiently evidenced her findings, including those regarding paragraph C of Listing 12.03.

In determining whether a claimant's impairments satisfy the requirements for a relevant Listing, the ALJ must identify the relevant listed impairment or impairments, discuss the relevant evidence, and compare that evidence to the requirements in the applicable Listings. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986); *see Nelson v. Astrue*, C.A. No. 0:07-3114-HFF, 2009 WL 742724, *1, 5 (D.S.C. Mar. 19, 2009) (remanding for further proceedings because ALJ provided no discussion of the Listings and did not explain his finding that claimant had not met or medically equaled a Listing).

In *Cook*, the Fourth Circuit considered the sufficiency of the following findings by an ALJ in determining that claimant did not satisfy a particular Listed impairment:

> "An examination and x-rays of the right hip and left shoulder in May 1983 established the existence of severe osteoarthritis with moderate to severe limitation of motion of the claimant's shoulders, elbows, wrists, knees, hips, neck, and back as well as markedly decreased grip. However, the claimant's arthritis impairment does not meet or equal in severity the requirements of Section 1.01 of Appendix 1, Subpart P as there is no joint enlargement, deformity, effusion, or the other mandated criteria."

*Cook*, 783 F.2d at 1172 73 (quoting a portion of the ALJ's decision under review). Among other reasons, the Fourth Circuit found that explanation to be deficient because the ALJ "failed to compare [the claimant's] symptoms to the requirements of any of the four listed impairments, except in a very summary way." *Id.* at 1173. In this case, the court finds that, much like the analysis that the *Cook* court found lacking, the ALJ did not specifically compare Plaintiff's medical records or symptoms to the paragraph B criteria of Listing 12.03.

Plaintiff argues that she satisfies the paragraph A and paragraph B criteria of Listing 12.03 and that the ALJ erred by finding she did not satisfy the paragraph B criteria. Pl.'s Br. at 15. She cites to the opinions of her treating physician, Dr. Redge, and her counselor, Mr. Bridgman, both of whom opined that she satisfied the paragraph B criteria because they found Plaintiff had marked difficulties in maintaining social functioning and in maintaining concentration, persistence, and pace. Pl.'s Br. at 15 (citing Tr. at 260, 587).

The Commissioner argues that the ALJ's findings are supported by substantial evidence and that the ALJ appropriately considered and discounted Dr. Redge's opinion. Def.'s Br. at 16 18. The Commissioner does not focus on Plaintiff's argument that the ALJ erred by not fully discussing the requirements of Listing 12.03 and by not articulating specific reasons for her findings that Plaintiff did not satisfy paragraph B or paragraph C. Instead, the Commissioner cites to various portions of Plaintiff's medical

29

records that he argues support the ALJ's determination that Plaintiff did not satisfy the criteria of paragraph B or paragraph C.  Def.'s Br. at 16  18.

The type of "post hoc rationalization" offered by the Commissioner does not remedy the deficient analysis by the ALJ.  *Pease v. Astrue*, C/A No. 0:08-3498-PJG, 2009 WL 4586346, *4 (D.S.C.  Dec. 1, 2009) ("But regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ.") (internal citations and quotations omitted); *see also Ledbetter v. Astrue*, 8:10-195-JDA, 2011 WL 1335840, *10 n.6 (D.S.C. April 7, 2011) (noting the court's review is limited to the reasons the ALJ, not the Commissioner's lawyers, articulated for decision) (internal citation omitted).  The court finds that the ALJ erred by not supporting her findings regarding Listing 12.03's paragraph B criteria with discussion of record evidence.  Without more, the court cannot determine whether the ALJ's findings are supported by substantial evidence.

The ALJ's consideration of Listing 12.03's paragraph C criteria is even more lacking.  The record contains several opinions regarding whether Plaintiff satisfied the paragraph C requirements of Listing 12.03, but the ALJ makes no mention of these portions of the opinions.  In the September 2008 Mental Impairment Questionnaire completed by Plaintiff's treating psychiatrist Dr. Redge, she opined that Plaintiff had a "residual disease process that has resulted in such marginal adjustment that even a

minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." Tr. at 585 (identical to criteria of Listing 12.03C(2)).  Dr. Redge also opined that Plaintiff had a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement."  Tr. at 585 (identical to criteria of Listing 12.03C(3)).  Plaintiff's counselor Mr. Bridgman opined in a Mental Impairment Questionnaire he completed on January 4, 2007 that Plaintiff satisfied the paragraph C criteria.  *See* Tr. at 260 (opining Plaintiff satisfied criteria that mirror the C(1) and C(2) criteria).

The record also includes opinions that Plaintiff did not satisfy the criteria of paragraph C in Listing 12.03.  State agency consultant Mr. Coyle opined in his February 13, 2007 PRTF that Plaintiff did not satisfy the paragraph C criteria of a Listing.  Tr. at 418.  Judith Von, Ph.D., found likewise in her April 6, 2007 opinion.  Tr. at 488.

The ALJ did not reference any evidence, including these reports, in her finding that "the evidence fails to establish the presence of the 'paragraph C' criteria."  Tr. at 15. Although the ALJ references the opinions of Dr. Redge, Mr. Bridgman, and Mr. Coyle in the portion of her decision considering Plaintiff's RFC, she never notes the particulars of the paragraph C criteria at all, nor does she note that three health care professionals considered whether Plaintiff satisfied such criteria.  Instead, her evaluation of the opinions of Dr. Redge and the other professionals focused solely on the findings

regarding activities of daily living, social functioning, and concentration/attention.  Tr. at

17  18.[2]

The Commissioner argues that because the ALJ "sufficiently evidenced his

consideration of Dr. Ridge's opinion," the court has "no reason to believe he did not

consider Dr. Ridge's opinion that Plaintiff met Listing 12.03(C)."  Def.'s Br. at 20.  The

court finds this argument unpersuasive.

The ALJ's cursory findings regarding the paragraph C criteria of Listing 12.03 are

insufficient.  The ALJ offers no evaluation of Plaintiff's medical record or other record

evidence to support the finding.  The ALJ does not even set forth the requirements of

paragraph C.  Without more, the court cannot determine whether the ALJ's findings are

supported by substantial evidence.  The Fourth Circuit requires more.  *Cook*, 782 F.2d at

1172 (requiring the ALJ to include "in the text of her decision a statement of the reasons

for that decision."); *see also Davis v. Astrue*, 2:07-231-MBS, 2008 WL 540899 (D.S.C.

_____

[2]In considering Plaintiff's RFC at step four, the ALJ is required to make detailed
analyses of various functions itemized under the broad categories found in paragraph B of
Listing 12.03. SSR 96-8p, *4 ("The mental RFC assessment used at steps 4 and 5 of the
sequential evaluation process requires a more detailed assessment by itemizing various
functions contained in the broad categories found in paragraphs B and C of the adult
mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the
PRTF."). Although the ALJ acknowledged this requirement, she did not discuss the
detailed items under the paragraph B categories. Although Plaintiff did not raise this in
her appeal, the court orders that the Commissioner's decision on remand contain that
detailed analysis as well, which will aid the court in determining whether the ALJ's
decision is supported by substantial evidence. *See Lowe v. Astrue*, C/A No.
3:07-1766-RBH, 2008 WL 4449940, *4 (D.S.C. Sept. 26, 2008) (remanding for
consideration of RFC in accordance with SSR 96-8p).

Feb. 22, 2008) (remanding because ALJ did not adequately set out the applicable listing criteria, did not compare the criteria with the claimant's symptoms, and did not explain her reasons the claimant did not satisfy a Listing).

Because the ALJ did not discuss the portions of the record opinions regarding the paragraph C criteria, the court cannot know whether the ALJ considered those portions of the opinions. Remand is necessary for the ALJ to properly consider all requirements of Listing 12.03 and to cite to specific record evidence explaining her reasons for all findings related to Listing 12.03's paragraph B and paragraph C criteria. In evaluating opinion evidence concerning Listing 12.03C, the ALJ must remain mindful that a part of that Listing criteria recognizes that mental conditions such as schizophrenia may have periods of latency. *See* Listing 12.03C (setting out criteria for claimants whose schizophrenia with "symptoms and signs currently attenuated by medication or psychosocial support").

## 2. Treating Physician

Plaintiff's other allegation of error is that the ALJ improperly discounted the opinion of her treating psychiatrist, Dr. Redge. Pl.'s Br. at 19 25. Combining his discussion of this allegation of error with his response to Plaintiff's argument regarding the ALJ's analysis of Listing 12.03, the Commissioner argues that the ALJ appropriately considered and discounted the opinion of Dr. Redge.

SSR 96-2p provides that if a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given controlling weight[.]"  *See also* 20 C.F.R. § 404.1527(d)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). When assessing a treating source's opinion, the ALJ shall consider the factors in 20 C.F.R. §§ 404.1527(d)(2) through (d)(6).

When weighing and evaluating medical opinions, the ALJ is to consider the following: "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006); *Johnson v. Barnhart*, 434 F.3d at 654; 20 C.F.R. § 404.1527(d).  The rationale for the general rule affording opinions of treating physicians greater weight is "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (*quoting Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001)).  An ALJ, though, can give a treating physician's opinion less weight "in

the face of persuasive contrary evidence." *Mastro*, 270 F.3d at 178. Further, in undertaking review of the ALJ's treatment of Plaintiff's treating physician, the court notes that its review is focused on whether the ALJ's opinion is supported by substantial evidence and that its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Craig*, 76 F.3d at 589.

In considering Plaintiff's RFC, the ALJ indicated the weight she had given the opinion evidence of record. Tr. at 16 18. Regarding Dr. Redge, the ALJ stated as follows:

> I have also considered the medical source statement of Dr. Redge completed on September 18, 2008, in which she indicated that the claimant has marked limitations in social functioning and in concentration/attention (Exhibit 2IF).

> The opinion of a treating physician is entitled to controlling weight in the absence of persuasive, contradictory evidence; however, if a treating physician's opinion is not supported by clinical evidence, or if it is inconsistent with other evidence, it should be accorded significantly less weight. Social Security Ruling 96-2p. I give little weight to Dr. Redge's opinion since she indicated that the claimant has a global assessment of functioning (GAF) of 65,[1] represents only mild problems. In addition, her opinion is inconsistent with her own treatment notes that show that the claimant was doing well, had no involuntary movements, was not having psychotic symptoms, and had no medication side effects.

> [1]According to the *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, 1994*, a Global Assessment of Functioning of 65 indicates mild symptoms or some difficulty in social, occupational, or school functioning, but is generally functioning well and has some meaningful interpersonal relationships.

Tr. at 17  18 (footnote in original).

The ALJ also noted that she had considered portions of the opinion June 2007 of Mr. Bridgman.  Tr. at 18.  She correctly noted that Mr. Bridgman was not a treating source to whom controlling weight should be afforded if supported by the record, but that his opinion was to be considered pursuant to SSR 06-3p.  Tr. at 18.  She indicated that she had considered Mr. Bridgman's opinion that Plaintiff had marked limitations in social functioning and in concentration/attention, and that she had had three episodes of decompensation.  Tr. at 18.  She gave Mr. Bridgman's opinion "little weight" because it was "inconsistent with the treatment records" and with the GAF score of 65.  Tr. at 18.

The ALJ explained that she discounted Dr. Redge's opinion because it was inconsistent with her treatment notes that indicated Plaintiff "was doing well, had no involuntary movements, was not having psychotic symptoms, and had no medication side effects."  Tr. at 18.  Although not attributing those findings to specific treatment notes, earlier in her decision, the ALJ cited to select portions of Dr. Redge's treatment records from November and December 2005, September and December 2006, and March and June of 2007 as containing similar findings.  Tr. at 17.

As an initial matter, the court notes that, although Plaintiff was diagnosed with schizophrenia in 1991, she claims her schizophrenia caused her to be unable to work as of November 1, 2006.  Although review of her pre-November 2006 medical records may appropriately provide the ALJ, the Commissioner, and the court with a more thorough

understanding of Plaintiff's mental health, the ALJ improperly focused on those treatment notes in determining whether Plaintiff was disabled as of November 1, 2006.

Records subsequent to Plaintiff's alleged onset date that were not cited by the ALJ support Dr. Redge's 2008 opinion. For example, on November 18, 2006, Plaintiff went to the ER complaining of auditory hallucinations and that her nerves were bothering her. Tr. at 200 03. Several days later, Dr. Redge saw Plaintiff on an emergency basis because she had become combative with her family the previous night, was crying uncontrollably, and was having difficulty getting herself under control. Tr. at 243. Dr. Redge gave Plaintiff a Haldol injection eight days early and prescribed additional medication. Tr. at 243. When Dr. Redge saw Plaintiff for follow up on December 4, 2006, she noted that Plaintiff seemed to be sedated, and that Plaintiff had indicated that she did not know whether she was "coming or going." Tr. at 243. In June 2007, Dr. Redge saw Plaintiff and noted positive things about Plaintiff. Tr. at 503. However, she also noted that Plaintiff's affect was constricted and that her thoughts were disorganized. Tr. at 503.

Considering the record as a whole, the court cannot find that the ALJ's discounting of Dr. Redge's opinion was appropriate. Dr. Redge's opinion is not necessarily inconsistent with her treatment notes.

Additionally, the court finds that the ALJ placed improper emphasis on the GAF score of 65 that Dr. Redge assigned to Plaintiff in September 2008. Tr. at 17 18 (discounting Dr. Redge's opinion because she found Plaintiff had a GAF score of 65,

which represented "only mild problems."); *see also* Tr. at 18 (discounting opinion of Mr. Bridgman as inconsistent with a GAF of 65; citing the GAF score of 65 to support her finding that Plaintiff can perform "all the mental activities generally required by competitive work.").

A GAF score may reflect the severity of a patient's functioning or her impairment in functioning at the time the GAF score is given. Without additional context, a GAF score is not meaningful. *See Parker v. Astrue*, 664 F. Supp. 2d 544, 557 (D.S.C. 2009) (stating that "Plaintiff's GAF score is only a snapshot in time, and not indicative of Plaintiff's long term level of functioning."). Dr. Redge found Plaintiff's GAF to be 65 in September 2008. Tr. at 581 86. Although not mentioned by the ALJ or the parties, the court's independent review reveals that, one month later, Dr. Redge examined Plaintiff and assigned her a GAF score of 60. Tr. at 591. According to the DSM-IV, a GAF of 60 may indicate more significant deficits than the GAF of 65 on which the ALJ focused. In *Parker v. Astrue*, the court cited to the DSM-IV's description of several ranges of GAF, as follows:

> A GAF score of 51-61 indicates moderate symptoms (e.g., circumstantial speech and occasional panic attacks) or moderate difficulty in social or occupational functioning (e.g., no friends, unable to keep a job). A GAF score of 61-70 is less severe and indicates only that a person has "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally function[s] pretty well, [and] has some meaningful

interpersonal relationships." Diagnostic & Statistical Manual
of Mental Disorders-Text Revision (DSM-IV-TR) (2000).

664 F. Supp. 2d at 549 n.3.

In addition to the changeable nature of a GAF score and its limited validity, the Commissioner has explained that the GAF scale "does not have a direct correlation to the severity requirements in [the Commissioner's] mental disorders listings." *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50746-01, 50764 65 (Aug. 21, 2000). The court finds that the ALJ erred in relying heavily on the GAF score of 65 in discounting the opinion of Plaintiff's treating psychiatrist Dr. Redge and her counselor, Mr. Bridgman.

On remand, the ALJ is to focus on records from November 2006 forward and consider all evidence in evaluating the findings of Dr. Redge and Counselor Bridgman and others at each step of the sequential evaluation. Further, she is reminded that the GAF, standing alone, is of limited significance.

III.    Conclusion

For the reasons set forth above, this matter is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative action as set out above.

IT IS SO ORDERED.

May 9, 2011                                   Shiva V. Hodges
Florence, South Carolina                      United States Magistrate Judge